92 So.2d 881

### G. E. CHRISTIAN

v.

### Flaudie M. REED.

6 Div. 848.

Supreme Court of Alabama.

Feb. 21, 1957.

534

R. G. Redden, Vernon, and Bill Fite, Hamilton, for appellant.

COLEMAN, Justice.

This is an appeal from a decree of the Circuit Court of Lamar County, In Equity, establishing a boundary line between lands of appellant on the north and lands of appellee on the south.

The appellant, complainant below, filed his bill alleging that appellant and appellee are coterminous landowners; describing appellant's land; also describing appellee's land; and alleging the true boundary line to be as follows:

"The line established and located by the survey of U. S. Estes in the month of October, 1953; that is, beginning at a Wood Stake 30 feet north of the Southwest corner of Lot No. 119 on the East side of Walnut Street in the Nesmith Addition to Town of Vernon, Alabama; thence on a bearing of north 87 degrees 30′ East a distance of 580 feet to a Wood stake which is 92 feet south of Complainant's Northeast corner."

Appellee, respondent below, filed her answer admitting coterminous ownership; admitting correctness of descriptions in the bill; denying that the true line is as claimed by appellant; and alleging the true line to be as follows:

"Beginning at a point on the east side of Walnut Street in the Town of Vernon, Alabama, which is 694 feet north of the center of a certain ditch which crosses said Walnut Street near the southwest corner of Lot No. 125 in Nesmith Addition to the Town of Vernon, Alabama, according to the map or plat of said Nesmith Addition to the Town of Vernon, Alabama, as the same appears of record in the office of the Judge of Probate of Lamar County, Alabama, which said point may be further identified as being on the east side of said Walnut Street in said Town of Vernon, Alabama, a distance of 182 feet south of the accepted northwest corner of the lot owned by and in possession of Joe Price Redus and Bessie Redus, and which said point may be further identified as being on the east side of said Walnut Street 90 feet south of the accepted southwest corner of said Redus lot, and which said point may be further identified as being on the east side of said Walnut Street 105 feet north of the accepted northwest corner and 250 feet north of the accepted southwest corner of the lot owned by and in the possession of J. T. Maddox and Gaila F. Maddox, and from said point said line runs in an easterly direction and at right angles to said Walnut Street a distance of 580 feet to a certain stake with a tack in it, and along which line stakes were set every hundred feet by C. R. Franks, Surveyor, Registry No. 607, on to-wit, Dec. 31, 1953."

Appellee also alleged that she and her predecessors in title have had adverse possession of the land on the south side of the line as claimed by her for more than 20 years preceding the filing of the bill of complaint, and that said line has been recognized as correct for more than said 20 year period.

The trial judge established the boundary line as claimed by the respondent-appellee.

The only assignment of error is:

"The Court erred in rendering the decree on page 83 in favor of the appellee wherein it established the true boundary to be as claimed by appellee."

The evidence was taken ore tenus before the trial judge.

The only question before this court is whether or not the finding of the trial court is unsupported by the evidence or is palpably wrong so that we ought to reverse that decree.

"A decree establishing a line between coterminous lands on evidence submitted ore tenus in open court is presumed to be correct. * * * And in such a case the trial court's conclusions will not be disturbed unless palpably erroneous or manifestly unjust. * * *" Holoway v. Carter, 261 Ala. 51, 72 So.2d 728; 2 Ala. Dig., Appeal and Error, ☜1009(1).

The lands involved in this suit lie on the east side of Walnut Street, are located in Lots 119 and 121 of the Nesmith Addition to Vernon, Alabama, and include also additional land adjoining and lying east of Nesmith Addition, which additional land lies between the extended north and south boundary lines of the respective lots of the parties.

The lots of the subdivision adjoin each other from south to north in the following order: Lot 125 (the southern most lot), Lot 123, Lot 121, Lot 119, and Lot 114 (the northern most lot).

The 1900 plat gives Lot 121 a width of 220 feet from south to north on Walnut Street, and Lot 119 the same width or frontage, being 440 feet for both lots.

In or prior to 1919, Lots 121 and 119 were owned by J. P. Morton and his wife,

Belle, or one of them. On later dates, the Mortons conveyed land in those two lots, in four separate parcels.

For convenience in this discussion, these four parcels are designated from south to north as the Maddox, Reed, Christian, and Redus lots, respectively.

In 1919, the Maddox lot on the south was conveyed; the Reed lot on the north was next conveyed in 1928; the next lot on the north, Christian lot, in 1932; and the next north lot (Redus) in 1935.

1919 description of Maddox lot recites in part:

*"Beginning at the northwest corner of Lot no. 123"* and run east along boundary line between Lots 123 and 121; thence north 145 feet; thence west parallel with south boundary line of said lot to Walnut Street; thence "Southward along said street * * * to S.W. corner of Lot no. 121, place of beginning." (Emphasis supplied.)

1928 description of Reed lot recites in part:

*"Beginning on the East side of Walnut Street 145 feet North from the Southwest corner of Lot No. 121"* and run eastward "parallel with south boundary of lot 121," thence north 105 feet, thence westward parallel to south boundary of Lot 119 to Walnut Street, thence south along east side of Walnut Street 105 feet to place of beginning. (Emphasis supplied.)

1932 description of Christian lot recites in part:

*"beginning at a point 120 feet North of the South West corner of Lot no. 119 * * * and running* Southward along said Walnut Street 90 feet *to the Northwest corner of G. S. Smith's lot."* (Emphasis supplied.)

Note that in 1932, G. S. Smith owned the Reed lot.

1935 description of Redus lot recites in part:

"Beginning at the southwest corner of Lot number 114" * * * (Note that this corner is also the northwest corner of Lot 119) * * * "thence south along the west (this should be east) boundary line of Walnut Street a distance of 92 feet, *thence east along the north boundary line of M. G. Anderson's lot"* * * * (In 1935, M. G. Anderson owned the Christian lot) * * * "thence northwesterly 92 feet" * * * "thence *west parallel with the north boundary line of M. G. Anderson's lot* * * * to Walnut Street * * *" (Emphasis supplied and parenthesis added.)

Through mesne conveyances, appellant now holds the Christian lot, and appellee the Reed lot.

The lengths of the street frontage of these four lots, according to the deeds, from south to north, are respectively: 145, 105, 90, and 92 feet, a total of 432 feet, contrasted with the total frontage of 440 feet for Lots 119 and 121 shown by the original plat. Here is a difference of 8 feet.

Surveyor Estes testified that there was a difference of 8 feet between his measurement of 2356 feet on the ground and the distance of 2348 feet shown on the "Town Plat." The testimony is not clear, but this measurement appears to have been from a starting point "on the south property line of the street south of the courthouse," and measuring south to a ditch at the south boundary of Lot 125.

Estes stated:

"That could have been an 8-foot difference in the starting point. If you added them it would be a difference of 16-feet."

Estes testified that in locating the disputed line, he started at the point south of the courthouse mentioned above, and measured

south down east side of Walnut Street to locate the southwest corner of Lot 119.

When asked:

"Did you make measurements as to the property line between Defendant and J. T. Maddox?", Estes stated:

"No sir, not particularly."

Surveyor Franks, also called by appellant, had made a survey in this case and established the disputed line 8 feet north of the line established by Estes. The line established by the decree below is the line of stakes set out by this witness, Franks, on December 1, 1953.

Franks also testified that he made a survey starting at the same place Estes started, and from this point, using courses and distances based on the town plat, he found the dividing line between Christian and Reed "8-feet south of the old fence and ditch line," and "it measured about the same" as Estes had found it. Franks also found a discrepancy of 16 feet from the street to the ditch.

On cross-examination, Franks testified that the north boundary line of the Maddox lot is well defined with a fence, except an extension to the road, and that measuring from the extension on the same bearing to the road, he measured 105 feet to the Reed lot, and that it: "came in line with the old fence out there."

He testified further that coming from this direction (south to north) the hedgerow clearly reflected the ownership, and that he found the measurements from the southwest corner of "Judge Maddox's" (Christian's?) to be 90 feet south of Joe Price Redus.

He found a stake there with a tack in the end and ran a line to the street; that when he ran this line a fence was there just north of the ditch, the fence did not go all the way.

Page 81 of the transcript shows the following question to Franks and his answer:

"Q. And that line you ran which you determined coming from the south, were there physical markings to show that had been a well-established land line, difference in contour in the land, and a ditch and fence which showed very plainly a well defined line?

"A. Yes, a well defined line—an old line."

Anderson owned and occupied the Christian lot ten years, 1932 to 1942. G. S. Smith owned and occupied the Reed lot for 21 years, 1928 to 1949, which included all the time Anderson was his neighbor on the north.

Smith had bought the Maddox lot in 1919 and sold to J. T. and Gaila Maddox in 1923. Smith bought the Reed lot in 1928. Smith testified that the Maddox lot, Reed lot, and Christian lot all start from the southwest corner of the Maddox lot, and that the Maddox lot and Reed lot were measured from the southwest corner of the Maddox lot.

Smith testified that he built a house on the Reed lot; had a garden extending to the north boundary of the lot and cultivated that lot to the north boundary; that the north boundary of that lot was recognized as the north boundary of the Reed lot; that Anderson bought the Christian lot from the Mortons and accepted the north line of Smith's garden fence as the boundary line between them.

The evidence shows that there was a Pyracantha bush, some crape myrtle bushes and a birdbath near the disputed line. Smith and Anderson both testified that these items were located on the Reed lot. The evidence shows that the Estes line would place the Pyracantha bush and birdbath on the Christian lot and would run through the crape myrtle bushes. The Franks' line places these items on the Reed lot.

Anderson testified that when he bought the Christian lot, he established the north line of that lot measuring 90 feet northward from each end of Smith's garden fence and from the front corner so that "I had three stakes there."; and "accepted his garden fence as being the line."

Surveyor Estes testified that there was an 8 foot wide strip between the Christian lot and the Redus lot which had not been deeded to anybody. Anderson testified that he built a garage or car shed near the north line of the Christian lot.

Christian testified that his garage is built within a few inches of the line between himself and Joe Price Redus and that he had drilled a well, "like what I thought was the line between" his lot and Redus as a joint enterprise with Redus.

The testimony shows that the line referred to with reference to the car shed and well is marked with a fence and lies 90 feet north of the line surveyed by Franks and established by the trial court.

On page 72 of the transcript, the following appears:

"Mr. Young: Now, then, if it please the Court I want to make a motion that the Court go to the scene of the property—only three or four blocks—for the purpose of seeing the physical facts that cannot well be brought out here. It won't take but a few minutes. I don't want to take testimony but just want the Court to see the physical facts.

"Mr. Fite: Judge, we'd like for the Court to look at it but we didn't interrupt or insist.

"The Court: I'll look at it after we get through. As a matter of fact, I had spoken to the sheriff about showing me where it is before you mentioned it."

Appellee's brief contains this statement:

"All of these physical facts were plainly visible to the Court when he visited the scene after he had heard all the testimony."

▪ The decree appealed from recites that the cause was submitted to the court "on the pleading and the evidence heard orally before the court on the 11th day of June, 1954, at which time the court took the case under advisement." The decree does not recite whether or not the court inspected the property. This court, therefore, cannot review this case as one where the premises were actually inspected by the trial court.

▪ Argument reciting matters not disclosed by record cannot be considered. 2 Ala.Dig., Appeal and Error, ☞714(5), and authorities there cited.

In summary, here are two surveys to establish a disputed line. One survey starts at a northern point and comes south. The other survey starts at a southern point and goes north. The boundary line established by this latter survey was accepted as the true line by the trial court, who heard and saw the witnesses testify.

We have set out some of the evidence supporting the trial court. There is contrary evidence in the record. We have carefully considered all the evidence in the record.

▪ The rule is that when the chancellor sees and hears the witnesses testify, the findings of the trial court which determine questions of fact will not be disturbed on appeal unless palpably wrong. Authorities, supra.

The reason for that rule generally given is that the trial court can better judge the credibility of witnesses by seeing and hearing them testify. Without regard to credibility, an additional sound reason is demonstrated in this case.

This record is full of questions and answers which obviously refer to a point on a plat or map. The point referred to, however, in the great majority of those ques-

tions and answers is designated in the record by nothing except the words "here" and "there." Such testimony is meaningless without the pointing finger, or some additional information, to designate the particular spot on the map intended by the witness.

The trial court could see the spot on the exhibit to which the witness pointed. This court cannot.

 We do not find that the decree appealed from is unsupported by the evidence, or is contrary to the overwhelming preponderance of the evidence, or so palpably wrong as to require this court to reverse. Therefore, the decree appealed from is affirmed.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and GOODWYN, JJ., concur.