PER CURIAM.
Kelly Horwitz appeals from the Tuscaloosa Circuit Court’s denial of her contest of an election for the' office of Tuscaloosa Board of Education, District 4. We reverse and remand.

Facts and Procedural History

Horwitz and Cason Kirby were both candidates in the August 27, 2013, election for District 4 of the Tuscaloosa Board of Education. Kirby was certified as the winner of the election. The certified vote totals were 416 votes for Kirby and 329 votes for Horwitz.
On September 6, 2013, pursuant to § 11-46-69, Ala.Code 1975,[1] Horwitz filed a statement of contest regarding the August 27, 2013, election. On September 13, 2013, the trial court conducted a hearing to establish dates for trial and further procedures. With the agreement of the parties, the trial court ordered that on October 11, 2013, Horwitz would provide Kirby with notice of the number of alleged illegal voters and the grounds for challenging each voter. The parties agreed that the case would be given priority and that it would be set for trial on October 31, 2013. The trial court also stated:
“It was further recognized and agreed • that no voter would be compelled to testify for whom he oh she voted under Section 17-16-42 of the Code of Alabama and Rule 506 of the Alabama Rules of Evidence until his or her vote was determined to be illegal.”
On October 11, 2013, Horwitz filed, a “Notice of the Nature of the Evidence” and listed 397 allegedly illegal votes, which included votes cast by approximately 375 students and members of Greek organizations on the University of Alabama campus, i.e., fraternities and sororities. Hor-witz argued that the votes were illegal based on lack of residency, bribery or misconduct, and ineligibility. In her memorandum of law supporting her notice, Hor-witz argued that the primary basis for her claim regarding lack of residency was an assertion that a substantial number of voters had not resided in or had' their domicile in District 4 for 30 days prior to the August 27, 2013, election, as required by § ll-46-38(b), Ala.Code 1975. According to the trial court, Horwitz
“contended that a substantial number of students, particularly members of Greek organizations, moved into sorority and fraternity houses or other dwellings, such as apartments, within thirty days of August 27, 2013, but, prior to that time, did not reside in the district.”
■ Kirby denied Horwitz’s allegations and argued that, before moving into the sorority houses, fraternity houses, or other dwellings in August 2013, the students had either resided in other dorms or dwellings *946 in District 4 or had lived in District 4 the previous year but had simply visited their family homes or resided elsewhere during the summer. Kirby also argued that those voters had established their domicile in District 4 and their intent to return to the district before their temporary absence from the district during the summer.
Kirby filed an objection and a motion to dismiss, in which he argued that Horwitz’s notice of the evidence was not sufficient to comply with the requirements set forth in § 17-16-48, Ala.Code 1975.[2]
On October 15, 2013, the trial court conducted a hearing to determine whether Horwitz’s notice of the evidence was sufficient and to áddress Kirby’s objection and motion to dismiss. On October 17, 2013, the trial court entered an order denying the motion to dismiss and holding that Horwitz’s notice was sufficient and that the election contest would proceed.
On October 21, 2013, the trial court conducted a status conference for the purpose of determining the procedure for the trial of the case. During this status conference, a procedure was established whereby the evidence of the legality or illegality of the ballots challenged by Horwitz would be presented to the trial court on October 31 and November 6 by way of affidavits to be collected from challenged voters. The purpose of this approach was to avoid the necessity of a weeks-long trial involving live testimony from approximately 400 voters and other witnesses on the variety of factual issues that could bear on such issues as domicile and possible illegal inducements to vote. Moreover, this approach also dovetailed with the trial court’s properly announced intention of not requiring any voter to testify as to for whom he or she had voted until it was first determined that his or her vote was illegal. If, based on the affidavit testimony submitted by Horwitz in this first phase of the trial (“Phase I”), at least 87 votes were found to be illegal, the contest would proceed to a second phase or “final hearing” on November 18 (“Phase II”), in which the voters who cast the illegal ballots could be subpoenaed to testify at trial as to for whom they voted. (Also in Phase II, those who cast the allegedly illegal ballots who did not return an affidavit for purposes of Phase I could be subpoenaed to testify regarding issues relating to the legality of their ballots and, if their votes were found to be illegal, for whom they had voted.)
As recounted in Kirby’s brief to this Court:
“[T]he Court ordered, and the parties agreed, that the trial proceedings would begin on October 31st and would essentially be bifurcated. The Court ordered, and the parties agreed, that Contestant and Contestee would prepare an affidavit form with questions addressing the issues in this contest to be submitted to all challenged voters rather than have a hearing with nearly 400 challenged voters. The parties elected to .use these affidavits as trial evidence to establish qualifications of the voters or lack thereof. The affidavit, if possible, would soli *947 cit certain information to~ allow, the Court to sufficiently determine the legality of each vote and would be trial evidence. The Court placed no restrictions on the parties, as to what questions would be included .in the affidavit other than to instruct the parties that, if an agreement could not be reached, the Court itself would develop the questions for the affidavit.
“Pursuant to the Order, for all affidavits submitted prior to October 31st, the Court would hold a hearing on October 31, 2013, on evidence and arguments as to whether the testimony contained in the affidavits sufficiently' established domicile or inducement to vote. The Court further set a second hearing for November 6, 2013, to determine the same issues for affidavits gathered at or after the October 31st hearing.”
(Emphasis added.)[3]
The parties subsequently submitted an agreed-upon affidavit. The trial court accepted the affidavit and ordered that it be distributed to the challenged voters.
On October 31, 2013, and November 6, 2013, the trial court conducted hearings on the affidavits that had been submitted. On or about November 7, 2013, Horwitz filed a post-hearing memorandum of law. In her memorandum, Horwitz attached exhibits in which she provided a “detailed analysis” regarding various categories of votes that she contended were illegal.
On November 13, 2013, the trial court entered its “Final Order Denying Contest” *948 (“the final order”) in which, among other things, it concluded that the affidavits established that no more than 70 illegal votes had been cast in the election. On November 24, 2018, Horwitz filed a motion to alter, amend, or vacate the trial court's judgment; that motion was denied by operation of law on February 24, 2014. Hor-witz appealed the trial court’s order denying her election contest.

Standard of Review

“Before we begin our discussion, we first consider the standard of review applicable. At oral argument, the con-testee Hale argued that the ore tenus standard of review should apply and that applying that standard would support the dismissal. This Court has stated:
“ Th reviewing the trial court’s findings of fact in [an] election contest, we . apply the same standard used by appellate courts when the trial- court in a nonjury case has taken a material part of the evidence through ore tenus testimony; that is, we will not disturb the trial court’s findings of fact unless those findings are plainly and palpably wrong and not supported by the evidence.’
Williams v. Lide, 628 So,2d 531, 534 (Ala.1993), citing Mitchell v. Kinney, 242 Ala. 196, 200, 5 So.2d 788, 797 (1942). That same principle of law is also stated in such cases as Gaston v. Ames, 514 So.2d 877 (Ala.1987), and Cougar Mining Co. v. Mineral Land & Mining Consultants, Inc., 392 So.2d 1177 (Ala.1981).
“Should we apply the ore tenus standard to this case, in which there was no evidence presented ore tenus that was relevant to the .main legal issues before this Court and in -which, as to the number of votes cast1 for the two candidates, the case was decided based upon deposition testimony and, a review of documentary evidence, consisting mostly of absentee affidavits and ballots? We think not. Our appellate courts have held on several occasions that, where no testimony is presented ore tenus, a reviewing court will not apply the presumption of correctness to a trial court’s findings of fact and that the reviewing court will review the evidence de novo. See Hospital Corp. of America v. Springhill Hospitals, Inc., 472 So.2d 1059, 1060-61 (Ala.Civ.App.1985), where the Court of Civil Appeals stated:
“ ‘The rationale behind the ore ten-us rule has historically been that the trial court deserves a presumption of correctness when it is in a position to actually see [the witnesses] and hear the testimony, observing firsthand the demeanor of the witnesses. Christian v. Reed, 265 Ala. 533, 92 So.2d 881 (1957); Steed v. Bailey, 247 Ala. 407, 24 So.2d 765 (1946); Barran v. Barran, 431 So.2d 1278 (Ala.Civ.App.1983). Considering that the trial court heard only part of the testimony of one witness, including only a partial direct examination and no cross examination, and that the case was otherwise tried exclusively on the basis of numerous depositions and exhibits, we hold that the ore tenus rule does not apply. Consequently, no presumption of correctness will be accorded the trial court’s findings on the evidence, and this court will sit in judgment on the evidence as if it had been presented de novo. Smith v. Dalrymple, 275 Ala. 529, 156 So.2d 622 (1963); Lepeska Leasing Corp. v. State Department of Revenue, 395 So.2d 82 (Ala.Civ.App.), writ denied, 395 So,2d 85 (Ala.1981).’
“See also, Muscogee Constr. Co. v. Peoples Bank & Trust Co., 286 Ala. 258, 238 So.2d 883 (1970), and Continental Elec. *949 Co. v. City of Leeds, 473 So.2d 1056 (Ala.Civ.App.1984).”
Eubanks v. Hale, 752 So.2d 1113, 1122 (Ala.1999).
Similarly, in this ease, no oré tenus evidence was presented. Our review of this election contest and the evidence before us therefore is de novo.

Analysis

The duty of a trial court in an election contest is clear:
“If, on the trial of the contest of any election, either before the judge of probate or the circuit court, it shall appear that any person other than the one whose election is contested, received or would have received, had the ballots intended for the person and illegally rejected been received, the highest number of legal votes, judgment must be given declaring such person duly, elected, and such judgment shall have the force .and effect of investing the person thereby declared elected, with full right and title to have and to. hold the office to which the person is declared.elected. If it appears that two or more persons have, or would have had, if. the ballots intended for them and illegally rejected had been received, the highest and equal number of votes for such office, judgment must be entered declaring the fact, and such fact must be certified to the officer having authority to fill vacancies in the office -the election to which was contested. If the person whose election is contested is found to be ineligible to the office, judgment must be entered declaring the election void and the fact certified to the appointing power. If the party whose election is contested is found to have been duly and legally elected, judgment must be entered declaring the party entitled to have and to hold the office to which the party was so elected.”
§ 17-16-59, AlaiCode 1975.

I. Voters Challenged Based on Residency

Horwitz first argues that the trial court erroneously found that 108 “University students who indicated no intention to abandon their former domicile, prior to registering to vote in Tuscaloosa were rei> roactively domiciled in District 4 from the first day they lived there.”
Section 11-46-38, Ala.Code 1975, provides:
“(a) At all municipal elections the elector must vote only in the ward or precinct of his or her residence where he or' she is registered to vote arid at the box or voting machine to which he or she has been assigned.
"(b) No person may vote at any election unless he’ or she is a registered and qualified elector of the State of Alabama, who has resided in the county SO days and in the ward 30 days prior to the election, and who has registered not less than 10 days prior to the date of the election at which he or she offers to vote_”
(Emphasis added.)[4]
It was undisputed that the challenged voters registered more than 10 days before the date of the election. Therefore, the only question is whether certain voters “resided” in District 4 30 days prior to the election. In order to “reside” for this purpose, one must establish “domicile”:
*950 “The parties correctly assert that ‘the terms “legally resides,” “inhabitant,” “resident,” etc., when used in connection with political rights are synonymous with domicile.’ Mitchell v. Kinney, 242 Ala. 196 at 203, 5 So.2d 788 (1942).”
Osborn v. O’Bair, 401 So.2d 773, 776 (Ala.1981).
“The terms ... denote the place where the person is deemed in law to live, which may not always be the place of one’s actual dwelling, and are to be contra-distinguished from temporary abode. Caheen v. Caheen, 233 Ala. 494, 172 So. 618 [(1937)]; Allgood v. Williams, 92 Ala. 651, 8 So. 722 [ (1891) ].
[[Image here]]
“The law is also established that a domicile, once acquired, is presumed to exist until a new one has been gained \facto et animo [in fact and intent].’ Bragg v. State, 69 Ala. 204 [(1881)]; Caheen case, supra. And in order to displace the former, original domicile by the acquisition of one of choice, actual residence and intent to remain at the new one must concur. ‘Domicile of choice is entirely a question of residence and intention, or, as it is frequently put, of factum and animus.’ 28 C.J.S., Domicile, p. 11, § 9.”
Ex parte Weissinger, 247 Ala. 113, 117, 22 So.2d 610, 513-14 (1945) (emphasis added).
“Thus, a temporary relocation away from one’s established domicile does not result in a change of domicile without proof of intent to establish domicile elsewhere.”
25 Am.Jur.2d Domicile § 25 (2014) (footnotes omitted). “ ‘Domicile is “established by physical presence in a place in connection with a certain state of mind concerning one’s intent to remain there.” Mississippi Bank [Band] of Choctaw Indians v. Holyfield, 490 U.S. 30, 48, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989).’ ” In re Kline, 350 B.R. 497, 501 (Bankr.D.Idaho 2005) (quoting In re Halpin, 94 I.B.C.R. 197, 197 (Bankr.D.Idaho 1994)).
“As a general proposition a person can have but one domicile, and when once acquired is presumed to continue until a new one is gained facto et animo, and what state of facts constitutes a change of domicile is a mixed question of law and fact. Lucky v. Roberts, 211 Ala. 578, 580, 100 So. 878, 879 [ (1924) ], and cases cited.
“One who asserts a change of domicile has the burden of establishing it. Caldwell v. Poliak, 91 Ala. 353, 357, 8 So. 546 [ (1890) ]. And ‘where facts are conflicting, the presumption is strongly in favor of an original, or former, domicile, as against an acquired one,’ etc. 28 C.J.S., Domicile, p. 36, § 16.”
Ex parte Weissinger, 247 Ala. at 117, 22 So.2d at 514 (emphasis added).[5]
“Temporary absence from one’s residence for the purposes of his employment and the like, without the intent to abandon the home town and acquire a domicile elsewhere permanently, or for an indefinite time, does not forfeit his right to vote. Pope v. Howie, 227 Ala. 154, 149 So. 222 [(1933)]; Caheen v. Caheen, 233 Ala. 494, 172 So. 618 *951 [(1937)];. 8 Alabama Digest, Elections, 264.”
Wilkerson v. Lee, 236 Ala. 104, 107, 181 So. 296, 298 (1938).
In Pope v. Howle, 227 Ala. 154, 156, 149 So. 222, 223 (1933), this Court stated:
“Domicile of the elector is a mixed question of law and fact, dependent upon the intention and acts of the elector.... In Holmes v. Holmes, 212 Ala. 597, 599, 103 So. 884, 886 [ (1925) ], the law of domicile is thus stated: A domicile once acquired is presumed to continue until a change, facto et animo, is shown. Bragg v. State, 69 Ala. 204 [ (1881) ]. If there was a change, there must have been both an abandonment of his former domicile with no present intention to return, 'and the establishment of another place of residence with intention to remain permanently, or, at least, for an unlimited time; the former may be inferred from the latter. Allgood v. Williams, 92 Ala. 551, 8 So. 722 [ (1891) ]; Caldwell v. Pollak, 91 Ala. 353, 8 So. 546 [ (1890) ]; Young v. Pollak, 85 Ala. 439, 5 So. 279 [(1888)]; Merrill’s [Heirs ] v. Morrissett [76 Ala. 433 [ (1884) ]], supra.’ ”
(Emphasis added.)
The authorities are in agreement, then, that there must be not only a decided intention to abandon one’s former domicile as such, but also a “certain state of mind” as to making a new locale one’s home. The application of this general rule to students results in a general rule that their place of domicile does not change simply because they leave home to attend college:
“[I]t is a settled principle of law, recognized expressly or by implication in virtually every cáse discussed'herein :.. that an individual’s mere presence in a particular community as a student results neither in his acquisition of a voting residence there nor in the loss of his existing voting residence elsewhere, such presence being regarded as temporary in the absence of independent facts and circumstances indicating a contrary'intent.”
William H. Danne, Jr., Annotation, Residence of Students for Voting Purposes, 44 A.L.R.3d 797, 818 (1972) (emphasis added). This is no less true “even if [the student] is uncertain as to his future plans and, therefore, [might] settle in the school community following the completion of his studies.” Id.[6]
A relatively recent Illinois case involving a question of venue in a wrongful-death case is instructive as to issues that often arise in domicile cases involving college students:
“Illinois courts generally construe the term ‘resident’ to mean the place where an individual intends to live on a permanent basis. The subjective intent of the person whose residence is at issue controls the determination. Webb v. Morgan, 176 Ill.App.3d 378, 386, 125 Ill.Dec. 857, 531 N.E.2d 36, 41 (1988). Obviously, Nick could not have intended to re.main in a university fraternity house on *952 a permanent basis. Such housing is, by definition, temporary: Perhaps he enjoyed living in Decatur and hoped to remain there upon graduation; perhaps he hoped to return to Glen Carbon, where he had grown up and still had friends. Perhaps he .hoped to-, move elsewhere. As a practical matter, most 20-year-old university students do not know where they will live on a permanent basis after graduation. Fortunately, however, we need not ascertain Nick’s subjective intent in order to determine his residence. Once a residence is established, it is presumed to continue, and a person only establishes a new residence if that person physically moves to a new home and lives there intending to make it his permanent home. Webb, 176 Ill.App.3d at 386, 125 Ill.Dec. 857, 531 N.E.2d at 41. Unless such a change of1 residence has been established, a person does not lose his original residence. Webb, 176 Ill.App.3d at 386, 125 Ill.Dec. 857, 531 N.E.2d at 41. Prior to attending college, Nick unquestionably resided with his mother, Brenda, in Glen Carbon. Thus, he was a Madison County resident at that time. For the reasons discussed, we do not think the record contains any evidence to demonstrate- that Nick had acquired a new residence. . He was thus a Madison County resident at the time of his death.”
Schwalbach v. Millikin Kappa Sigma Corp., 363 Ill.App.3d 926, 932-33, 300 Ill.Dec. 788, 794, 845 N.E.2d 677, 683 (2005).
In Ptak v. Jameson, 215 Ark. 292, 298-99, 220 S.W.2d 592, 595 (1949), the Arkansas Supreme Court explained:
“The court announced the rule to be applied in passing upon the eligibility of the student that ‘A student who comes to Fayetteville for the sole purpose of securing an education does so without making a change of residence. It is necessary to have a bona fide intention to make Fayetteville his home permanently or for an indefinite period and not to limit it to the time necessary to get an education.’ This appears to conform with the weight of authority as shown in the annotation to the case of Anderson v. Pifer, 37 A.L.R. 134.”
This Court’s decision several years ago in Ex parte Coley, 942 So.2d 349 (Ala.2006), follows the foregoing principles and, in addition, makes clear that evidence of a variety of factors, at least where available, must be considered and that the voter’s own self-serving statement is not disposi-tive .of the domicile issue. The issue in Coley was where a college student was domiciled when a wrongful-death action was filed against her. The action was filed in Jefferson Circuit Court in January 2005 against Tyne Coley by the personal representatives of the deceased’s estate. Jefferson County was the county in which Coley’s parents lived and where she lived until she started attending Judson College in Perry County in September 2002. Coley filed a motion to transfer the case to Perry County, arguing that her domicile had changed to Perry County by the time the action was filed. The trial court denied Coley’s motion, and she petitioned this Court for a writ of mandamus. This Court explained:
“[T]he question is whether' Coley had, when this action was filed in January 2005, effectively changed her domicile to Perry County. In answering the question, the trial court was to consider whether Coley physically resided in Perry County and whether she had the intention to remain there permanently so that she had abandoned Jefferson County as her domicile.”
942 So.2d at 352 (emphasis added). After quoting the requirements for a change of *953 domicile from Weissinger, supra, quoted above, the Coley Court noted that “Coley has the burden of establishing that she had abandoned Jefferson County as her county of residence and reestablished permanent residence in Perry County; the presumption is against a finding that she had.” 942 So.2d at 353 (emphasis added; citing Weissinger).
In evaluating .whether Coley had changed her domicile from Jefferson County to Perry County at the time the action was filed, this Court listed several facts as evidence of Coley’s domicile. First, it noted facts that Coley listed in support of her argument that she had changed her domicile to Perry County by the time the action was filed:
“Coley offered the following facts to the trial court, and argues them to this Court, in order to show that she had the requisite intention to change her county of permanent residence to Perry County. Coley graduated from Pinson High School in Jefferson County in 2002. In September 2002, she began attending Judson College in Perry County. Judson College requires its students to live in on-campus housing. Thus, from September 2002 through June 2005 (which encompasses the date of the accident) Coley lived on the campus of Judson College in Perry County. Coley also contends that she did not return to Jefferson County to visit her parents on weekends, but stayed with her parents at their second home, a farm in Perry County. Coley also, contends that she did not return to Jefferson County during the summer months of her college years; instead, -she either attended summer school at Judson College or worked at a camp in St. Clair County. Coley says- that. during those summers she spent only a . night or two with her parents in Jefferson County; Coley also contends that she spent Thanksgiving and Christmas holidays at her parents’ farm in Perry County. Coley stated in her affidavit filed in February. 2005 that she does not consider her parents’ home in Jefferson County to be her home; that she no longer has a bedroom- there; and that she considers her permanent residence to be her parents’ farm in Perry County.
' “Coley further contends that she ‘is registered to vóte' in Perry County.’ Coley includes her voter-registration card, which indicates that she was registered to vote in Perry County as of June 27, 2005, the date of her deposition, and also indicates ‘last change: 05/05/2005.’ Coley does not state.that she was registered to vote > in Perry County as of January 2005, when this action was fíüecl.” /; ;
942 So.2d at 353-54 (footnotes omitted). Next, the Court noted facts the plaintiffs listed in support of their argument that Jefferson County remained Coley’s domicile at the time the action was filed:
“In support of their argument that in January 2005-Coley had not exhibited the intention to reside permanently in Perry County, the Pottses argue:- (1) that Coley was registered to vote in Jefferson County when this action was filed;[7] (2) that Coley’s bank accounts *954 list her home address as being in Jefferson County; (3) that Coley represented to lenders that she was a resident of Jefferson County; (4) that Coley represented to the Internal Revenue Service and the Alabama Department of Revenue on her tax returns filed in April 2005 that she was a resident of Jefferson County; (5) that Coley represented to health-care providers that she was a resident of Jefferson County; (6) that Coley represented to the driver’s license division of the State of Alabama that she resided in Jefferson County when she renewed her driver’s license in October 2004; and (7) that Coley is a member of a church in Jefferson County.”
942 So.2d at 354 (footnote omitted).
Despite the evidence to the contrary, particularly Coley’s own testimony, this Court concluded that Coley had not changed her domicile at the time the action was filed, reasoning as follows:
“The evidence regarding Coley’s intention to abandon Jefferson County as her permanent residence and establish permanent residency in Perry County is conflicting. ‘[W]here facts are conflicting, the presumption is strongly in favor of an original, or former, domicile, as against an acquired one.’ Weissinger, 247 Ala. at 117, 22 So.2d at 514. Because of the presumption against a change of domicile, the conflicting evidence as to domicile, and the fact that the burden rests on Coley to prove the change of domicile, we cannot conclude that the trial court erred in concluding that in January 2005 Coley had not abandoned Jefferson County as her county of permanent residence and established permanent residency in Perry County.”
942 So.2d at 354.
Horwitz argues that information from the submitted affidavits demonstrates that two groups of voters did not meet the 30-day domicile requirement to vote in the August 27, 2013, election.[8]
*955 First, Horwitz contends that “[t]here are 55 voters who registered to vote in Tusca-loosa County ... at an address in District 4 where they had not resided for 30 days next preceding the election, but who had lived someplace in District 4 the previous spring” before leaving the city for the summer.[9] Concerning those 55 voters, Horwitz noted that in their affidavits all but 2 of them listed an address outside Tuscaloosa on their driver’s licenses and listed their vehicles as registered in a different county.[10] Many of these voters had renewed their driver’s licenses in their hometowns during the summer of 2013. Sixteen of those 55 voters filed income taxes in 2013, and all of those voters listed their hometown addresses as their residences on those returns. Also, of those 55 voters, 35 of them were registered to vote in a location other than Tuscaloosa in May 2013 (the other 20 apparently not having registered to vote anywhere as of May 2013). In addition, 25 of the 35 voters who had been registered elsewhere in May actually voted in a location outside Tuscaloo-sa in the last election in which they voted before the August 27, 2013, election.
All 55 voters listed an address outside Tuscaloosa as the address to which they have the University of Alabama send their grades. Thirty of those 55 voters stated' that they did their banking with a bank outside Tuscaloosa. Of these 55, 42 answered undecided or “indefinite” (or to like effect) when asked about their career plans after graduation. Although many indicated uncertainty or wrote the word “indefinitely” when asked how long they would remain in Tuscaloosa, 53 of the 55 stated that, “after graduation, I do not have definite plans where I intend to live.”
Horwitz described the second category of voters who did not meet the 30-day residency requirement to vote in the August 27, 2013, election as follows:
“There are 53 voters who registered to vote in August 2013 who moved into District 4 more than 30 days prior to the election' (according to their affidavits), but. whose affidavits provide strong evidence that they had no intention to ‘abandon completely’ their former domicile any earlier than the day they at least registered to vote in Tuscaloosa.”
(Footnote and emphasis omitted.) Concerning these 53 voters, Horwitz observes that, in their affidavits 52 of them listed their former domicile outside Tuscaloosa as the address on their driver’s licenses while 1 did not provide a driver’s license address but hád an out-of-state license. Forty-nine of those voters had cars registered outside Tuscaloosa County. Several of those 53 voters renewed their driver’s licenses shortly before the August election, and at least 6 of them renewed their driver’s license after the date they provided as their July move-in date into their District 4 address. Twenty-óne of those 53 voters still had out-of-state driver’s licenses as of October 2013. Horwitz also notes that 36 of the 53 voters were registered to vote in a city other than Tuscaloosa before they registered for the August 27, 2013, election. Moreover, 25 of those 36 voters ae- *956 tually voted in , those other cities in an election before the August 27, 2013, election. Additionally,' 19 of those 53 voters filed income taxes in 2013, and all of those voters listed their pre-college addresses outside Tuscaloosa as their residences on those returns.
All 53 voters listed an address outside District 4 as the address to which they have the University of Alabama send their grades. Twelve of those 53 voters stated that they did their banking with a' bank outside Tuscaloosa. Thirty-four-provided either no answer or answered “undecided” (or similar answer) - when asked if they knew their carder plans after completing school in Tuscaloosa. Similar to the group of 55 discussed above, although many .of the 53 indicated they were uncertain how long they would stay in Tuscaloosa, 50 of the 53 indicated that they did not have definite plans to live in Tuscaloosa “after graduation.” The remaining three, F.R.B., C.S., and A.C.M., indicated that they did have definite plans to stay in Tuscaloosa.[11]
As noted above, our review of this case is de novo. Based on our review of the affidavits and applying the legal presumptions and principles described above, especially the presumption our law recognizes as to students who attend a college somewhere other than their hometowns, we- conclude that all but 3 of the 108 ballots described above were due to be rejected in the District 4 election. As noted, pur cases emphasize the principle that a person can have only one domicile and that, once a domicile is acquired, it is presumed to be a person’s domicile until a new domicile is gained in fact and intent. See Weissinger, 247 Ala. at 117, 22 So.2d at 513. When a court seeks to determine if a person has established a new domicile, it must evaluate whether the person “had the intention to remain there permanently so that [the person] had abandoned [the previous] domicile.” Coley, 942 So.2d at 352. As the Court stated more fully in Pope:
“ ‘A domicile once acquired is presumed to continue until a change, facto et ani-mo, is shown. Bragg v. State, 69 Ala. 204 [ (1881) ]. If there was a change, there must have been both an abandonment of his former domicile with no present' intention to return, and the establishment of another place of residence with intention to remain permanently, or, at. least, for an unlimited time; the former may be inferred from the latter.’ ”
227 Ala. at 156, 149 So. at 223. (quoting Holmes v. Holmes, 212 Ala. 597, 599, 103 So. 884, 886 (1925) (emphasis added)). Further still, our cases make it clear that when there is conflicting evidence as to whether a person has changed- his or her domicile, “ ‘the presumption is strongly in favor of an original, or former, domicile, as against an acquired one.’” Coley, 942 So.2d at 354 (quoting Weissinger, 247 Ala. at 117, 22 So.2d at 514).
As indicated in Coley, as well as in the other authorities previously discussed, these general principles find particular application in the case of students who remove themselves from their “hometowns” for ■ the purpose of attending college in another locale. To reiterate:
“[I]t is a settled principle of law, recognized expressly or by implication in virtually every case discussed herein ... that’an individual’s mere presence in a particular community as a student results neither in his acquisition of a vot *957 ing residence there nor in the loss of his existing voting residence elsewhere, such presence being regarded as temporary in the absence of independent facts and circumstances indicating a contrary intent.”
Danne, 44 A.L.R.3d at 818 (emphasis added). And again, this is no less true “even if [the student] is uncertain as to his future plans and, therefore, [might] settle in the school community following the completion of his studies.” Id.
All but 3 of the 108 students whose votes are at issue stated that they had not formed a definite intent to live in any particular place following graduation. As noted, however, more- than the absence of . a definite intent to return to one’s former domicile is necessary for the law to recognize one’s abandonment of that domicile and the adoption of a new one.
The trial court appears to have reached a contrary conclusion by drawing from the decision in District of Columbia v. Murphy, 314 U.S. 441, 62 S.Ct. 303, 86 L.Ed. 329 (1941), in which the United States Supreme Court stated that “persons are domiciled [in the District of Columbia] who live here and have ho fixed and definite intent to return and make their homes where they were formerly domiciled.” 314 U.S. at 454-55. In Murphy, however, the Court was specifically addressing the issue of domicile for federal employees who come to work in the District of Columbia. In evaluating the issue, the Court specifically noted that “[t]he District of Columbia is an exceptional community” where “[t]hose in Government service ... are not engaged in local enterprise, although their service may be localized” and, “[b]ecause of its character as a federal city, there is no local political constituency with whose activities those living in it may identify themselves as a symbol of their acceptance of a local domicile.” 314 U.S. at 452. The Court further stated that “it is apparent that the -present cases are not governed by the tests usually employed in [domicile] cases where the element of federal service in the Federal City is not present.” 314 U.S. at 454.'
Despite the fact that the Murphy Court made it clear that it was applying a different test for domicile because of the unique situation 'of federal employees working in the District of Columbia, that Court still observed that “[a]ll facts which go to show the relations retained to one’s former place of abode are relevant in determining domicile,” Murphy, 314. U.S. at 457, 62 S.Ct. 303. It listed among those facts the place where the person has voted, the type of job the person holds, i.e., whether the job is “continuous or emergency, special or war-time in character; whether requiring fixed residence in the District or only intermittent stays-,” and “[w]hat relations has he to churches, clubs, lodges, and investments that identify him with the District.” Id. Perhaps most notably for present purposes, the Murphy Court emphasized that “[o]ne’s testimony with regard-to. his intention is of course to be given .full and fair consideration, but is' subject.to the infirmity of any self-serving declaration, and may frequently lack persuasiveness or even be contradicted or negatived by other declarations and inconsistent acts.” 314 U.S. at 456.
Therefore, just as in Coley, “[b]ecause of the presumption against a change of domicile [and] the conflicting evidence as to domicile,” we cannot conclude that 105 of the 108 voters Horwitz challenged for failure to meet the residency requirement had established Tuscaloosa as their new domicile before they voted in the August 27, 2013, election.
*958 Before turning to another set of voters at issue in the election contest, it is important to address two other ideas cited by the trial court as bases for its judgment. First, the trial court based its judgment in part on its holding that “Alabama [has] codified a presumption that student voters are domiciled in the district where they are residing and attending college” by enacting § 17-3-11, [Ala.Code 1975,] which provides for boards of registrars annually to go to certain college campuses to register qualified voters.[12] The issue of domiciliary status is not mentioned in the statute, however. Neither the text nor the history of § 17-3-11, Ala.Code 1975, indicate that it creates any such presumption.
The Coley Court gave no indication that a'presumption exists that a college student is domiciled where he or she is attending college. To the contrary, the Court specifically stated that “Coley has the burden of establishing that she had abandoned Jefferson County as her county of residence and reestablished permanent residence in Perry County [where she attended college]; the presumption is against a finding that she had.” Coley, 942 So.2d at 353 (emphasis added). Further still, as Hor-witz correctly notes, § 17-11-3, Ala.Code 1975, contains a specific provision making clear that a student may vote absentee if he or she “is enrolled as a student at an educational institution located outside the county of his or her personal residence attendance at which prevents his or her attendance at the polls.” § 17-ll-3(a)(4), Ala.Code 1975. If anything, § 17-11-3(a)(4) says as much or more about where the legislature anticipated college students would vote as does § 17-3-11.
Finally, the trial court cited § 17-3-32, Ala.Code 1975, in support of its conclusion that the students’ presence in Tuscaloosa to attend college established a presumption that they were domiciled there. Section 17-3-32 provides:
“No person shall lose or acquire a domicile either by temporary absence from his or her domicile without the intention of remaining or by navigating any of the waters of this state, the United States, or the high seas, without having acquired any other lawful domicile, or by being absent from his or her domicile in the civil or military service of the state or the’United States.”
Beyond ensuring the right to vote to members of our armed forces stationed in Alabama, § 17-3-32 does nothing more than codify the presumption in favor a domicile once established. The trial court employed § 17-3-32 to conclude that students who left Tuscaloosa for the summer of 2013 did not cease to reside in Tuscaloo-sa because of that temporary absence. But employing the statute in this way skips over the simple fact that the students in question had acquired a domicile before ever arriving in Tuscaloosa to attend college. Especially because we are dealing here with college students, the statute must first be applied to the individ *959 ual’s absence from the hometown he or she left for the purpose of attending college.
Again, based on the applicable presumption as to the continuance of domicile, 'especially as it relates to students who attend college in a city other than their “hometown,” and on our careful review of the evidence introduced as to the 108 students in question, we find that 105 of those students did not overcome that presumption. The ballots of those students therefore must be rejected.

II. Other Potentially Illegal Votes Based on Residency-Related Issues

In addition to the 108 votes discussed above, Horwitz contends that the affidavits establish the illegality of another 62 votes.[13] Based on the presumptions and legal principles discussed above, we find the actual number of ballots within this group of 62 that are in fact illegal to be 54.[14]
A.
Horwitz argued that there were three newly registered 'voters who did not live in District 4 on the day of the election: A.B.J., S.H.M., and Z.G.S. Horwitz submitted an affidavit from Paula Marques,- in which Marques stated:
“On November 5-6, 2013, I viewed the Interactive District Map on the website of the City of Tuscaloosa, the specific address of which is tuscaloo-sa.maps.arcgis.com. In the inquiry box I entered the below addresses. A true and accurate screenshot of these inquiries is attached as Exhibit A.”
The screenshot of the district map thus introduced by Horwitz áppéars to support her. allegations ' regarding S.M.H. and Z.G.S. The same cannot be said of A.B.J., whose address actually appears to be in District 4. Accordingly, only two of those three votes appear to be illegal.
B.
Horwitz argued that 23 voters were not eligible to vote in the District 4 election because they did not live in District 4 during the 30 days preceding the election and because their previous residence in Tuscaloosa was not in District 4. Based on the affidavit evidence and an examination of the maps introduced into evidence by Horwitz, we agree that the addresses for 22 of these voters were, located outside District 4. The evidence did not, however, support her allegations as to one of those voters.[15]
C.
Horwitz also argues that there were six voters who cast provisional ballots that were counted but that should be excluded as illegal. Horwitz presented evidence in *960 dicating that the address of one of these voters,' A.F., as written on her provisional ballot, was not in District 4. Additionally, with regard to four voters — S.J., S.N., R.S., and A.L.T. — Horwitz introduced evidence indicating that the Tuscaloosa addresses at which they resided before August 2013 were located outside District 4. Finally, as to the sixth of these voters, C.P., Horwitz correctly points out that, in her affidavit, C.P. stated that, on July 28, 2013, her address was in Robinson, Texas, and that C.P. did not provide any other Tuscaloosa address prior to that. Accordingly, all 6 of those votes are due to be rejected as illegal.
D.
Horwitz identifies another group of 17 voters who had registered to vote in Tus-caloosa in anticipation of the 2012 presidential election but who had moved out of District 4 before the August 27, 2013, election. We agree that 16 of those voters failed to meet the residency requirement, and their votes must be rejected as illegal. As to the 17th voter, V.L.H., Horwitz asserted: “This voter’s affidavit states that she live[d] at 205 20th Street East on the day of the election.” Horwitz presented evidence indicating that 205 20th Street East is not in District 4. But in her affidavit V.L.H. actually stated that on the day of the election she lived at ⅛05 20th Street East. Horwitz did not present any evidence to specifically show that ⅛05 20th Street East is not in District 4.
E. .
Horwitz also argued that the registrations of 12 voters were void because they provided incorrect addresses on their voter-registration forms. Two of those voters — Z.S.B. and A.H. — did not return affidavits. Therefore, those voters would have been included in the 25 votes the trial court separately assumed could be proven to be illegal votes. With regard to the remaining 10 of these voters, we note as follows.
1.
Two of the 10 voters in this category— M.B.B. and C.A.L. — indicated in their affidavits that they did not live at the addresses listed on their registration forms. Therefore, their votes were illegal and should not be counted.
2.
Horwitz also contends that, with regard to seven of those voters, the addresses they listed on their voter registrations did not correspond to any of the locations they stated under oath in their affidavits to be the places they had lived. Her argument regarding two of those voters — K.A.J. and V.L.M. — is incorrect. The respective addresses listed for their voter registrations were the same as the addresses they provided as their current address and their address as of August 27, 2013. Therefore, it appears that Horwitz proved illegality only as to five of those seven voters.
3.
Horwitz also argues that the registration of J.H.A. was void. Specifically, she contends:
“At no point in time did this voter live where he registered to vote. The address he provided when he registered to vote is 902 University Blvd. That address- appears no place on his affidavit as a place he has ever lived. Further, that address is Graves Hall, College of -Education, which is not a residence.Thus, his voter registration is void and his vote does not count. As noted below, his newly registered fraternity brother, A.H., provided the same fictitious residence when he registered to vote. Both young men are members of Phi Gamma Delta.”
*961 Contrary to Horwitz’s assertion, however, the residential address listed for J.H.A. on Kirby’s charts is not 902 University Boulevard. Rather, it is 976 University Boulevard, which is the same address J.H.A. listed on his affidavit. . Further, Horwitz has not presented any other evidence to indicate that the address listed on J.H.A.’s voter registration was 902 University Boulevard. Additionally, Horwitz did not present any evidence indicating that 976 University Boulevard is not a residence. Therefore, she has not presented any evidence to establish that J.H.A.’s registration was void and that his vote was illegal.
4.
In sum, of the 12 voters discussed in.this subsection E, only 7 cast illegal votes.
F.
Finally, Horwitz identifies one voter, K.B.J., who “moved her registration to Montgomery prior to the August 27th election, but still voted in Tuscaloosa on that date.” This ballot is due to be rejected.
G.
Based on the foregoing, it appears that there were 54, rather than 62, additional votes that were illegal. Additionally, we determined in Part I of our analysis that, under applicable presumptions and' legal principles, 105 students had not' established a change of domicile to Tuscaloosa at least 30 days prior to the August 27, 2013, election. In sum, Phase I of the contest yielded a total of 159 illegal votes based on domicile and other eligibility issues discussed in Parts I and II of this opinion. This number, of course, is in excess of the 87 illegal votes Horwitz was required to show before she could proceed to Phase II of the election contest.[16]

III. Votes Horwitz Contends were Illegal Based on Misconduct

Horwitz also argues that the trial court erroneously denied her claim that certain votes were due to be excluded on the ground of voter misconduct. Specifically, she contends that the trial court erred when it concluded “that an inducement offered to a person to vote must be expressly conditioned on voting for a specific candidate to constitute misconduct under Alabama’s elections laws.”
Section 11-46-69, Ala..Code 1975, provides that one of the causes for which an election may be contested .is when there are “[o]ffers to bribe, bribery, intimidation, .or other misconduct calculated to prevent a fair, free, and full exercise of the elective franchise.” § ll-46-69(a)(5). Although the trial, court found that “the law is not clear as to whether an offer to bribe must be contingent, on voting for a particular candidate, the offer must be communicated to a voter, or whether the offer must be communicated ,to and accepted by a voter in order to invalidate that voter’s vote,” it ultimately concluded that “there must be an offer of inducement to vote for a specific candidate that is at least communicated to a voter before a vote can be invalidated.”
Horwitz counters that Code sections that define specific offenses for interfering with an election indicate that a specific inducement for a particular candidate is not necessary in order to determine that a vote is illegal as a result of bribery. For example, Horwitz cites certain subsections of § 11-46-68, Ala.Code 1975, which she says criminalize any attempt in a municipal *962 election to influence a vote through bribery, regardless of whether the attempt involves an inducement to vote for a particular candidate:
“(e) Any person who buys or offers to buy any vote of any qualified elector at any municipal election by the payment of money or the promise to pay the same at any future time or by the gift of intoxicating liquors or other valuable thing shall be guilty of a misdemeanor and, on conviction thereof, shall be fined not less than $50.00 nor more than $100.00.
“(f) Any person who by bribery or offering to bribe or by any other corrupt means attempts to influence any elector in giving his vote in a municipal election or to deter him from giving the same or to disturb or to hinder him- in the full exercise of the right of suffrage at any municipal election must, on conviction, be fined not less than $50.00 nor more than $500.00.
“(g) Any person who, by the offer of money or the gift of money or by the gift of intoxicating liquor or other valuable thing to any qualified elector at any municipal election or by the loan of money to such elector with the intent that the same shall not be repaid, attempts to influence the vote of such elector at such election, shall be guilty of a misdemean- or and, on conviction, shall be fined not less than $50.00 nor more than $500.00.”
Horwitz also cites § 17-17-34, Ala.Code 1975, which provides:
“It shall be unlawful for any person to pay or offer to pay, or for any person to accept such payment, either to vote or withhold his or her vote, or to vote for or against any candidate. Any person who violates this section shall be guilty, upon conviction, of a Class C misdemeanor.”
Even assuming for present purposes. that Horwitz is correct and that the law does not require that an otherwise improper inducement to vote in a municipal election be tied to a vote for a particular candidate in order to be illegal, she still did not provide any admissible evidence indicating that any such bribery occurred. As the trial court correctly observed:
“At the October 15th hearing on the sufficiency of Contestant’s Notice, Contestant submitted Facebook [social-media] messages, emails, and tweets [social-media messages] as evidence of inducement. However, these submissions are inadmissible hearsay. Courts are not permitted to base findings on allegations but rather only on admissible evidence.”
Additionally, Horwitz did not present evidence indicating that the challenged voters actually saw any of the e-mails or social-media messages or that any of the challenged voters received the wristbands that were allegedly being handed out in exchange for an “I Voted” sticker.[17] Although Horwitz did present some evidence indicating that members of a certain sorority had tickets to and/or attended a Backstreet Boys concert, she did not present any evidence to support her allegation that members of that sorority were told that if they registered to vote but did not vote they would not receive a ticket to the concert.
Horwitz does not dispute that she failed to present admissible evidence of voter misconduct in the form of bribery. She argues, however, that she was precluded from presenting admissible evidence be *963 cause, she says, the trial court did not allow her to depose any of the voters who were allegedly tied to the bribery schemes.
Horwitz’s argument is unavailing because of the format of the bifurcated trial. As previously noted, the determination of the illegality of votes resulting from both residency and inducement issues was, for those voters who returned affidavits, to be made based on those affidavits and any other evidence introduced at the October 31 and November 6 hearings. See discussion supra.[18]
The affidavit form distributed to the voters contained questions as to whether the voter had been asked by another to vote or had been pressured to vote, and whether the voter had cast his or her ballot voluntarily. This line of questions stopped short of inquiring into whether the voter had been induced to vote by an offer of something of value. Nor were there any questions as to whether those voters were even aware of the e-mails or social-media messages upon which Horwitz relied to attempt to establish voter misconduct. Horwitz did not call any witnesses to establish a connection between the votes she challenged for misconduct and the schemes she alleged induced those votes. Instead, Horwitz relied entirely on the affidavits and evidence she concedes was inadmissible hearsay. Therefore, the trial court did not err in concluding that Horwitz failed to prove the illegality of votes based on misconduct in the form of bribery.

Conclusion

Based on the applicable law and facts, we conclude that Phase I of the election contest yielded a total of 159 ballots due to be rejected. Accordingly, the judgment of the trial court is reversed and the cause is remanded to the trial court for the conduct by the trial court of Phase II of the contest in accordance with this opinion.
REVERSED AND REMANDED.
BOLIN, PARKER, MURDOCK, and MAIN, JJ., concur.
MOORE, C.J., and SHAW and BRYAN, JJ., concur in the result.
STUART and WISE, JJ., dissent.

. Section 11-46-69, Ala.Code-1975, provides, in pertinent part:
“(a) The election of any person declared elected to any office of a city or town may be contested by any person who was at the time of the election a qualified elector of such city or town for any of the following causes:
"(1) Misconduct, fraud, or corruption on the part of any election official, any marker, the municipal governing body, or any other person;
“(2) The person whose election to office is contested was not eligible thereto at the time of such election;
"(3) Illegal votes;
"(4) The rejection of legal votes; or
"(5) Offers to bribe, bribery, intimidation, or other misconduct calculated to prevent a fair, free, and full exercise of the elective franchise.”

. Section 17-16-48, Ala.Code 1975, provides:
"No testimony must be received of any illegal votes or of the rejection of any legal votes in any contested election commenced under thp provisions of this article unless the party complaining thereof has given to the adverse party notice in writing of the number of illegal votes and by whom given and for whom given, and at what precinct or voting place cast, or the number of legal votes rejected, and by whom offered, and at what precinct or voting place cast, which the party expects to prove on the trial. Such notice must be served personally or left at the residence or usual place of business of the adverse party at least 10 days before the taking of testimony in reference to such votes.”

. The affidavits were a way to more efficiently determine whether there was a prima facie case in the sense of there being at least 87 illegal ballots, thereby warranting proceeding to the next phase of compelling the voters . who cast those ballots to testify for whom they voted. As the trial court explained at the October 31 hearing:
“The Court believes I have made it very clear that today was when we are taking testimony by affidavit. That was the vehicle.It by nature has to be because there has to be a determination made by the Court as to whether or not a vote is illegal before a question can be compelled to be answered by the Court for whom that person voted. We are in that stage of the trial right now."
Record Vol. 7, p. 127 (emphasis added). Later in the October 31 hearing, the Court stated:
"It was the Court's intention through our scheduling conference, and the Court is of the opinion that it was the agreement of the parties that we were to proceed with affidavits for evidentiary purposes for determining the legality of a vote and that today would be the day for which the first batch would be argued as to whether or not further testimony would be required of those voters, further testimony required of those voters with regard to for whom they voted, that we would establish legality at this stage. That was the Court's understánding of where we. were with regard to our status conference, scheduling conference.”
Record Vol. 7, p. 149 (emphasis added). See also Record Vol. 7, pp. 139-40 (statement by court); Record Vol. 7, p. 141 (statement by counsel for Horwitz); Record Vol. 7, p. 129 (statement by counsel for Kirby); Record Vol. 7, pp. 134-35 (statement by counsel for Kirby: "There was no exceptions to go under the affidavits and try to examine these students and try to find something.”). Later, the trial court repeated that "[t]he Court intends to have all the evidence it needs by the close of the hearing on November 6 to determine the legality of the votes challenged,” Record Vol. 7, p. 156, and that "[i]t was clear to this Court and to, apparently, the contestee that the affidavits were to be determinative of whether or not a vote was legal and further testimony would be taken oh the illegal vote.” Record Vol. 7, pp. 168-69 (emphasis added).
In the November 6 hearing, the trial court further explained that, if there was to be any live testimony at the Phase II hearing on November 18 from voters for whom no affidavit was received; it too would be limited to the questions on the affidavit: "[Tjestimony on legality of votes ... will be restricted to the same questions as the affidavit contains now. That is the method the Court set out and the parties agreed to initially.” Record Vol. 7, p. 211.

. Section 11-46-38 continues with a provision for voters who have resided within a given ward but who change their residence from that ward to another in the same city within 30 days of an election. Neither party makes any argument to this Court regarding the potential applicability in this case of that provision.

. The dissent ultimately concludes that college students have "the option of maintaining their domicile in their hometown and voting by absentee ballot or registering to vote where they attend school.” 197 So.3d at 971. The necessary premise for such a choice by the voter would be antithetical to the "proposition [that] a person can have but one domicile,” and that that domicile is a function of certain criteria, or a certain "state of facts.” Weissinger, 247 Ala. at 117, 22 So.2d at 514. It is a "mixed question of law and fact,” not of the voter's "option” or choice.

. It appears that the trial court and the dissent, as well as many of the students whose votes are in question in this case, equate the idea of an "uncertainty” on the part of student as to his or her plans following graduation with an intent to remain "indefinitely” in the town where his or her college is located. At one juncture, the dissent speaks of students who "may decide to remain in the place[] where they attend school indefinitely and may plan to try to seek employment” there. 197 So.3d at 966. Until such time as a student actually does decide to remain indefinitely in the place where he or she attends school, he or she does not satisfy the requisite standard. Uncertainty as to whether one will remain in a given place is not the same as actually having formed a present intent to remain in that place indefinitely.

. in Harris v. McKenzie, 703 So.2d 309, 311 (Ala.1997), this Court found "[r]egistration to vote [to be] a 'potent consideration’ for a court to take into account when determining one’s domicile." (Quoting Ambrose v. Vandeford, 277 Ala. 66, 70, 167 So.2d 149, 153 (1964).) And this may be assumed true for cases in. which the question of the right to .vote itself is not the issue. In this regard, it is important to note that Ambrose, the case quoted in Harris,, involved a challenge to the venue of a probate action and that Harris itself *954 did not involve a challenge to an elector's right to register to vote. Instead, the question in Harris was whether a candidate for the city council of Alabaster who had registered to vote in that city 27 years before the election in question (and who had physically resided in that city for all but 8 of those 27 years) was a resident of the ward for which he was a candidate in 1996.
In contrast, where the propriety of a resident’s registering to vote is itself the issue, it obviously makes little sense to consider as particularly “potent” that very act of registration. Were we to embrace such bootstrap or circular reasoning in cases where the right to vote in a given election is the issue, especially where the registration is in anticipation of that particular election, we would greatly weaken, and as a practical matter eliminate in most cases, our law’s domiciliary requirement and the presumption set by law for college students and other electors that a domicile for purposes of voting once established continues.

. In his brief, Kirby argues that, with regard to some of the voters Horwitz challenges on appeal, Horwitz raises arguments she did not present in the trial court; that she challenges voters who had submitted affidavits before the October 31, 2013, hearing, but whom she did not challenge until the November 6, 2013, hearing; that she challenges some voters on different grounds than those provided in her notice of election contest; or that she challenges voters on appeal even though she had previously abandoned her challenge to those voters in the trial court.
Horwitz challenges on appeal the same voters she challenged in the trial court. Further, in its final order, the trial court noted that Kirby had raised some of these same arguments but stated that it had considered all the evidence offered by Kirby; that it had reviewed all the affidavits submitted; and that it had reviewed evidence on all affidavits, regardless of "whether produced at the October 31st hearing, the November 6th hearing, or thereafter.” Thus, Kirby’s argument in this regard is unavailing.

. In his brief, Kirby argues that Horwitz did not challenge 1 of those 55 voters, W.O.K., in the November 6, 2013, hearing and that, thus, he cannot be challenged on appeal. The record indicates, however, that W.O.K.' was named in Horwitz’s original list of challenged voters submitted in October 2013, that W.O.K.’s affidavit was submitted as a challenged voter, and that W.O.K. was named as a challenged voter in Horwitz’s post-hearing brief. Therefore, W.O.K. is not being challenged for the first time on appeal.

. One of the two other voters did not have a driver’s license and the other one changed the address on his driver’s license during the election contest.

. We consider the ballots of these three voters to have been properly counted in the election.

. Section § 17-3-11(a) states:
"The board of registrars in each county shall visit each college or university, whether public or private, having an enrollment of 500 or more, which is located therein, at least once during the school year for the purpose of registering voters, and shall remain there for one full working day, weekends and holidays excepted. They shall give at least 12 days' notice of the time and place where they will attend to register applicants for registration, by bills posted at three or more public places and by advertisement once a week for three consecutive weeks in a campus newspaper, if there is one published on the campus. Each college or university affected by the provisions of this section shall provide space and accommodations for said board of registrars on their campus.”

. The trial court found there to be "no more than 70” potentially illegal ballots, although this number included the ballots of 25 voters from whom no affidavit was received.

. These voters are discussed below in the same lettered categories used by Horwitz in Exhibit A to her postjudgment motion.

. With regard to G.M.A., Horwitz stated:
"This voter moved into District 4 after'July 28. She spent the summer in New York, and prior to that, she lived at 800 31st Avenue, which is outside District 4.”
fo her affidavit, G.M.A. indicated that, from August 2012 through May 2013, she lived at 800 31st Avenue in Tuscaloosa. However, Marques’s affidavit did not indicate the district for 800 31st Avenue. Rather, Marques’s affidavit indicated that 800 31st Street was in District 7. Further, the screenshot of the district map also shows the district for 800 31st Street hot 800 31st Avenue. Thus, Horwitz did not present any evidence to establish that 800 31st Avenue was not in District 4.

. As previously noted, 25 additional voters did not return an affidavit. Under the protocol established by the trial court, those voters may be subpoenaed to testify in Phase II, i.e., in the “final hearing.”

. The wristbands allegedly would have entitled the voters to a free drink at certain participating establishments that served liquor.

. Because Horwitz agreed to the format of Phase I in which contested votes would be screened through the affidavit process, we likewise find no substance to her more general argument that the trial court erred when it limited her to presenting testimony by means of affidavits of the challenged voters rather than by live testimony.